# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### November 15, 2011 Session

## GEORGE SANDERS, Individually and d/b/a SMS Contractors, Inc.
### v.
## BREATH OF LIFE CHRISTIAN CHURCH, INC., ET AL.

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-05-0577-2     Arnold B. Goldin, Chancellor**

---

**No. W2010-01801-COA-R3-CV - Filed January 13, 2012**

---

This is a contract case.  The construction contract at issue provided for a specific contract amount plus a commission to the general contractor on any work done beyond the additional contract amount. After being dismissed from the job, the project manager for the general contractor sued both the general contractor and the owner of the property. The general contractor and the property owner then both sued the project manager and each other. After the property owner failed to satisfactorily respond to discovery requests, the trial court excluded all evidence of the property owner's damages that had not already been provided in detail in discovery. The parties proceeded to trial, at which point the chancellor ordered that all issues of damages beyond the base contract damages would be referred to a special master. After trial, the chancellor found that the property owner materially breached the contract and awarded the remaining balance to be paid on the contract to the general contractor. The special master awarded the project manager damages for work performed as a direct subcontractor on the project and awarded the general contractor delay damages and the commission on all extra work done on the project. The trial court concurred in the findings of the special master and the property owner appealed, raising a number of issues. We affirm in part, vacate in part, and remand for further proceedings.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Vacated in Part; and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Addie M. Burks and Stacy A. Clinton, Memphis, Tennessee, for the appellant, Breath of Life Christian Center Church, Inc.

Stephen H. Biller, Memphis, Tennessee, for the appellee, George Sanders, Individually and d/b/a SMS Contractors, Inc.

Elizabeth B. Stengel and Joseph T. Getz, Memphis, TN, for the appellee, Bricks, Inc.

**OPINION**

**I. Background**

This action arises from a contract for the construction of a new church building for Defendant/Appellant Breath of Life Christian Church, Inc. ("the Church")[1] in Memphis, Tennessee. The Church had previously entered into a contract with Capstone Construction Co. ("Capstone") to build the Church; however that contract was terminated and the project went unfinished for a number of months, during which time the structure was exposed to the elements.

In order to complete the new church building, Tanner George, the project manager for the Church, contacted George Sanders of SMS Contractors, Inc. ("SMS"). Because Mr. Sanders was unable to obtain the proper licensing and bonding requirements for a project of this magnitude, he brought in another general contractor, Bricks, Inc. ("Bricks"), which did have the necessary licensing and bonding requirements. On or about September 24, 2003, the Church entered into a general contract with Bricks to build the Church's new building. The contract provided that Bricks would be the general contractor on the project. Although Bricks and the Church were the only parties to the contract, Mr. Sanders was involved in the negotiations and entered into a separate contract with Bricks to serve as Bricks' project manager on this job.[2] The Church was aware that while Bricks was the general contractor, Mr. Sanders would be the point-person for the project and would be responsible for the direct supervision of the work on the site.

The contract price was $4,163,786.95, including $468,284.00 for the contractor's

---

[1] It is undisputed that the Church is incorporated under the laws of Tennessee. However, in negotiating and signing the contract, Pastor Sammy Holloway did not represent that the Church was a non-profit corporation or that he was president of that corporation. Due to the Pastor Holloway's failure to sign as a corporate representative, the Church argued at trial that it could not be liable on the contract. However, the trial court found that, despite the various "aliases" used by the Church throughout the contract and this litigation, including Breath of Life Christian Church, Breath of Life Christian Center, Inc., Breath of Life Ministries, and the Breath of Life Evangelistic Ministries, the Church remained liable on the contract. The Church does not take issue with the chancellor's conclusion on appeal.

[2] The contract between Mr. Sanders d/b/a SMS is not involved in this appeal.

profit.[3] The contract provided that progress payments would be made by the Church to the Contractor for work completed on the project, less a 10% retainage on each payment, which would be held by the bank until the conclusion of the contract. Final payment constituting the entire unpaid balance of the contract price was due upon completion of the project and the issuance of the certificate of payment from the architect. The contract states that the project should be completed within 365 days of commencement of the project. However, the contract also notes that:

> Cost listed below [i.e., the $4,163,786.95 contract price] applies to a 12 month period. Contractor will be paid additional time in the event the construction time exceeds the 12 months through no fault of the contractor. Extension/delay and or suspensions which are not the fault of the Owner shall be excluded from the 12 month period.

The contract also provides that payments due and unpaid under the contract accrue interest at a rate of 2.5% from the date payment is due.

Attached to the form contract were several exhibits that supplemented the terms of the agreement. Included was Exhibit D, which states that:

> It is understood and agreed that the contractor who initiated construction on the contract has defaulted and that Bricks, Inc. has been persuaded to recommence and be responsible for the completion of the project; however, in any circumstance, Bricks, Inc. must rely upon the estimates of costs submitted by Breath of Life Christian Church subject to the adjustments of this Cost Addendum, Exhibit "D."
>
> Bricks, Inc. Agrees to complete construction of the Breath of Life Christian Church for the sum of . . . [$4,163,786.95], which contract sum is subject to the additions and deletions herein provided according to the Schedule of Values (Exhibit "E") presented to Bricks, Inc. by Breath of Life Christian Church. In the event that the Schedule of Values submitted by the Breath of Life Christian Church is insufficient in any item or if required items are not there listed, and then the owner shall be required to pay those costs and Bricks, Inc. shall be entitled to receive 11% of the increased cost of those items.

---

[3] Later in the contract, the document makes clear that the contractor's profit is 11% of the total cost of the contract, which is $458,016.46. This miscalculation was corrected by the chancellor in his judgment and neither party takes issue with this change on appeal.

* * *

It is agreed and understood that some work has been provided by the initial contractor and others . . . . Therefore Bricks, Inc. will not be liable and does not guarantee any work performed by the previous contractor or others liable and will be paid as above provided for alternations [sic] additions, or corrections as needed.

The Church may at its election purchase materials, fixtures, and equipment in order to avoid payment of sales tax and thereby reduce its costs. The Church's consultant must receive prior notification and approve any work in excess of this shown on Schedule of Values (Exhibit "E"). If such work is unapproved by the Church's consultant, it will not be performed by the contractor.

The general contractor has the authority to select all new subcontractors, but every effort will be made to utilize those subcontractors recommended by the Church's consultant, if Bricks, Inc. is in [sic] discretion, is convinced that the subcontractor(s) is capable of performing the job . . . . The general contractor will make a good faith effort to seriously consider (as recommended by the owner) Wooten Mechanical, LLC as the mechanical subcontractor and Melvin Glover as the flooring subcontractor.

All additional work not reflected and/or included in the Schedule of Values (exhibit "E") attached hereto, which is requested or required by the owner to complete the overall project, will be billed at a cost plus 11% commission and submitted to the Church's representative for review and verifications.

* * *

If project exceeds 12 months due to fault of the contractor, the Contractor shall pay the interest on the loan for the project until the project has been completed or until default has been declared by the Owner. However, the Owner may allow a Contractor a forty-five (45) day grace period to complete the project. If thirty (30) days subsequent to the grace period, the project has not been completed, the Owner shall declare a Contractor default.

The contract was signed by Pastor Sammy Holloway, as the Church's representative, as well as Buck Owens, as the President of Bricks. Although Mr. Sanders participated in negotiating the contract, he was not a party to the contract. Work commenced on the project on September 30, 2003. Mr. Sanders served as the project superintendent for Bricks, dealing with all of the day-to-day issues of the project. Throughout the duration of the project, all

changes and additions were submitted through invoices and pay applications from Mr. Sanders to Mr. George. The invoices referred to the changes as unforeseen conditions, rather than change orders. Although some invoices were returned for modification to reflect the correct amount of contractor's profit to be paid by the Church, all invoices/pay applications submitted before December of 2005 were approved by Mr. George and paid by the Church.

There were numerous delays in the project, some of which were attributable to the defective work of Capstone; other delays were attributable to the parties, with each blaming the other. Regardless, the project was not completed on September 30, 2004. In December of 2004, the project remained uncompleted—the ceiling and flooring for the sanctuary were not in place, other areas of the church were not completed, and areas around the church building were not paved. However, based on a letter from Mr. George assuring him that the project was moving along well and would be completed soon, Pastor Holloway invited a number of people to the new church for a New Year's Eve celebration. When Mr. Sanders informed Pastor Holloway that the church would not be completed in time for New Year's Eve because the paving subcontractor did not work during the holidays, Pastor Holloway asked Mr. Sanders to fire the current paving company and hire a new one. Mr. Sanders refused, stating that the paving company had done nothing to warrant being removed from the church project and that all paving companies refused to work during the holidays. Based on this conversation, the Church then asked Bricks to terminate Mr. Sanders as project superintendent. Bricks subsequently terminated Mr. Sanders' employment on the project and worked to complete the sanctuary for New Year's Eve. The Church retained a different paving company, which was able to partially pave the church campus. As a result, the Church was able to hold New Year's Eve services in the sanctuary and Sunday church services every Sunday thereafter, though they were not yet allowed to use the rest of the new church building.

After Bricks terminated Mr. Sanders' employment, Mr. Owens took over as the project supervisor. The project was substantially completed in April 2005 when Bricks left the project, though the permanent certificate of occupancy was not issued until some months later.

On March 24, 2005, Mr. Sanders, individually and on behalf of SMS, filed a complaint in the Shelby County Chancery Court to Enforce Mechanics and Materialmens Lien, for Attachment, Judgment and Other Relief against the Church, Pastor Holloway, Bricks and NBC Bank.[4] The complaint alleged that the Church and Bricks failed to pay the profit that SMS was entitled to, as well as certain agreed overrun expenses in the amount of

---

[4] Although not contained in the record, all parties agree that NBC Bank was granted summary judgment removing it from this case on January 12, 2007. Therefore, NBC Bank is not a party to this appeal.

$235,480.47. On April 29, 2005, the Church filed an answer to Mr. Sanders' complaint, denying the material allegations contained therein. Likewise, on June 15, 2005, Bricks answered the complaint denying the material allegations contained therein and also asking that SMS indemnify Bricks for any liability to the Church.

On April 29, 2005, the Church filed a counter-claim against Mr. Sanders, alleging fraud, conversion, breach of contract, and violations of the Tennessee Consumer Protection Act. The Church also filed a cross-claim against Bricks, alleging negligent supervision of Mr. Sanders and the Church construction contract. Mr. Sanders answered the Church's counter-claim on June 10, 2005, denying the material allegations contained therein. On June 15, 2005, Bricks answered the Church's cross-claim, denying the material allegations and raising, *inter alia,* the defenses of waiver and estoppel. Bricks likewise filed their own cross-claim against the Church, alleging that the Church breached the contract.

Extremely protracted litigation ensued, characterized by numerous discovery disputes. In particular, the Church seemed reticent to fix its claim for damages and depositions of witnesses on behalf of the Church were not forthcoming. For example, immediately after the start of this litigation, Mr. Sanders issued a subpoena to Mr. George to take his deposition. It appears that Mr. George's deposition was once postponed due to allegations that the Church failed to provide documents needed to examine Mr. George or make him available for deposition. Regardless of the truth of these allegations, the record reveals that Mr. George's deposition was not taken until at least June 25, 2008, some three years later.

Interrogatories and requests for production of documents were no better. The Church responded to Bricks' first set of interrogatories on September 13, 2005, objecting to nearly every request as vague, overbroad, irrelevant, or covered by either attorney-client or work-product privilege. In response to what it saw as insufficient responses to its interrogatories, Bricks filed a motion to compel discovery on October 13, 2005. After a hearing on the motion on October 14, 2005, the chancellor sent the discovery dispute to the special master for a determination. When the Church later moved to quash a subpoena for the Church's bank records and Bricks subsequently filed a motion to compel, the chancellor again ruled that the issue would be heard by a special master and consolidated the bank records issue with the interrogatories issue.

After a hearing on Bricks' motions to compel, special master Ronald D. Krelstein filed his written report and recommendations on January 19, 2006. Therein, the special master found that: 1) the information subpoenaed from the banks was relevant and should be produced; 2) the Church's objections to the interrogatories, other than work product and attorney-client privilege, were overruled; and 3) no sanctions were recommended, though the special master recommended that the issue be taken up again if the Church's pastor was less

than candid at deposition or in the future production of documents. The Church filed its objections to the special master's report on February 3, 2007 arguing that: 1) the special master's ruling was not supported by material evidence; 2) there were numerous factual mistakes in the report that were not supported by the transcript; 3) the rulings relied on federal law rather than conflicting Tennessee Law; and 4) at the conclusion of the hearing, the special master revealed a prior professional relationship with one counsel's husband and an *ex parte* communication that required the recusal of the special master.[5] On March 6, 2006, the chancellor entered an order overruling the Church's objections and adopting the report of the special master.

Discovery disputes did not end at this point. On June 15, 2006, Bricks filed a Rule 30.02(6) Notice of Deposition of Breath of Life Christian Church, asking that the Church name a representative or representatives who would have knowledge relating to the Church's damages claims. On February 15, 2007, Bricks filed another motion to compel, again requesting that the Church designate an appropriate Rule 30.02(6) representative to testify about the Church's damages claims, as the representative previously designated by the Church, Faye Lynch, the Church's financial officer, repeatedly testified that she was not familiar with the Church's claimed damages and that either Pastor Holloway or Mr. George would be the appropriate person to testify as to those issues. The motion also asked that, in the event the Church fails to designate a proper Rule 30.02(6) representative or fails to state the names and specific subject matter of those expected to testify with regard to damages, the Church should be precluded from introducing any damages testimony at trial. A hearing was held on June 29, 2007, wherein the chancellor orally ruled that the Church would have ten days to designate a Rule 30.02(6) representative and to answer Bricks' interrogatories with the specific names of all witnesses expected to testify as to the Church's damages and the substance of that testimony. On July 5, 2007, the chancellor entered an order granting Bricks' motion to compel and in the alternative to exclude evidence. The order specifically states that, in the event the Church fails to designate a Rule 30.02(6) representative for damages or fails to reveal the specific names of those expected to testify about damages at trial as well as the substance of that testimony by July 9, 2007, all evidence regarding damages (other than that which had been specifically revealed through discovery on or before July 9, 2007) would be excluded. On July 10, 2007, at 12:00 am, counsel for Bricks received an unsigned, emailed document with amended answers to interrogatories, which again designated Ms. Lynch as the Church's Rule 30.02(6) representative. The answers to

---

[5] The special master filed an affidavit in response to the allegations that he had a prior relationship with counsel and that he had engaged in an *ex parte* communication. The affidavit stated that the alleged *ex parte* communication was to ask counsel to prepare the order and was in the presence of the court reporter. The special master also stated that he simply rented office space in the same building as Bricks' counsel's husband ten to fifteen years ago.

interrogatories named several people specifically, but gave only the business names for many of the subcontractors on the project. Additionally, the Church failed to specify the substance of any named or unnamed witness's testimony. On July 10, 2007, Bricks filed a motion to exclude all representative or non-representative witnesses on the issue of the Church's claimed damages. After a hearing on the motion, the chancellor granted Bricks' motion to exclude testimony, stating that:

> [The July 5, 2007] order is self-fulfilling and self-explanatory and provides for appropriate sanctions. [The Church] shall only be permitted to introduce evidence or testimony of damages from the Rule 30.02(6) representative(s) that has been designated as such by July 9, 2007, and the Breath of Life Christian Church shall only be permitted to introduce evidence or testimony of damages from those nonrepresentative witnesses who have been specifically named as having knowledge regarding the issues of damages and the Church has set forth, in detail, the knowledge and substance of what each such nonrepresentative witness would be expected to testify or to offer as testimony at trial by July 9, 2007. If such information has not been provided by July 9, 2007 as ordered by this Court then such person shall not be allowed to testify.

After several unsuccessful attempts to change the chancellor's ruling regarding the Church's damages,[6] the chancellor began the trial on August 18, 2008. On the first day of trial, the chancellor indicated that he was not prepared to hear evidence regarding thousands of invoices and that, if the evidence tended to move in that direction, he would refer issues of damages based on invoices to a special master. At that time, the Church's counsel stated that a referral to a special master would be "very helpful." At the conclusion of day two of the trial, the court did indeed order that he would only rule on issues of liability and that all issues of damages would be referred to the special master. None of the parties objected at this time. However, at the start of day three of the trial, the court modified its ruling based on discussion with the attorneys in chambers. Specifically, the chancellor stated that he would determine the base contract damages, but that all other damages based on additional work done over the base contract amount would be referred to the special master. At this time, the Church objected, as the Church's counsel had relied on the chancellor's earlier ruling and had failed to bring to court several documents that would be used to show the Church's damages or refute the damages of the other parties. Upon this objection, the court allowed a recess in order for the Church's counsel to return to her office to collect those documents. Upon resuming the trial, however, the Church's counsel again objected, stating that she was unable to find the exhibits that she would need for cross-examination or rebuttal. The court

___

[6] The Church filed a motion to reconsider, a motion for interlocutory appeal, and a motion to amend their complaint to allege an entirely new set of damages, not previously discovered.

overruled the objection, noting that the only witness who would testify that day was Pastor Holloway, and that the Church would have all weekend to find the missing exhibits.

The trial went on for seven days. Mr. Sanders testified that the Church had considerable influence over which subcontractors were hired on the project and some of those subcontractors caused delays. Many subcontractors, from flooring to electrical to landscaping, were members of the Church or were related to Church board members. In addition, Mr. Sanders testified that, due to defective workmanship on the part of Capstone, several parts of the project needed to be redone. The fact that this work was not anticipated in the contract slowed the progress of the new church building and required additional funds from the Church. Mr. Sanders also testified that many of the delays were caused directly by the Church and introduced several letters from Mr. Sanders to Mr. George to support his allegations. These delays included: 1) the Church's out-of-town decorator failed to make color selections for ceiling tiles, flooring, cabinets, exterior bricks, and numerous other items in a timely manner; 2) there was a six week delay in receiving detail drawings from the architect; 3) the Church failed to purchase materials in a timely manner or purchased incorrect materials for the project; 4) the Church failed to place the deposit for the baptistry, which delayed the delivery of the baptistry by forty days; 5) the Church failed to complete a credit application to the supplier of the foam needed to fabricate the stadium seating, which prevented the stadium seating from being completed on time; and 6) the Church failed to timely respond to Mr. Sanders' requests for information necessary for the electrical work on the sanctuary. Mr. Sanders further testified that all changes or additions to the project were labeled "unforeseen conditions" at the request of Mr. George, rather than the usual "change order." These unforeseen conditions included an October 18, 2004 letter from Mr. George to Mr. Sanders listing twenty-two design changes. This letter came less than two months before Mr. George wrote a letter to Pastor Holloway informing him that the "construction is going well" and should be completed before the end of December 2004. Mr. Sanders did testify that some of the subcontractors that he hired failed to complete their work in a timely manner. For example, Slick Finish Drywall and Painting was substantially behind on their work and SMS was required to finish the drywalling itself, though SMS chose to employ some of the Slick Finish employees. Another contractor failed to even show up to the project and Mr. Sanders was forced to hire another subcontractor.

Mr. Owens testified that he was not involved in the day-to-day operations of the project until the Church asked him to terminate Mr. Sanders' employment in December 2004. According to Mr. Owens, Bricks' role in the contract was merely to provide the bond needed to start the project and the actual supervision of the project was allocated to Mr.

Sanders through a contract with Bricks.[7] Mr. Owens did testify, however, that he often visited the project and was aware of the progress on the construction through his review of the pay applications. Once Mr. Owens took over direct supervision of the contract, however, he was at the site daily.

Mr. Owens also testified to the method of payment throughout the term of the contract. According to Mr. Owens, Mr. Sanders, as Bricks' representative, would prepare an application for payment, which was signed by Mr. Owens. The application would then be sent to the Church, where it would be signed by Pastor Holloway[8] and Mr. George. Once the signature was obtained, the application was sent to the architect for his signature. The application was then forwarded to NBC Bank, which would transfer funds from the Church's general account into the Church's construction account. The Church would pay those funds into an account jointly held by Bricks and the Church, i.e., the "Bricks/BOLCC" account. Mr. George and Mr. Owens would then jointly authorize payments from the Bricks/BOLCC account to the various subcontractors. Based on Mr. Owens' testimony that the pay applications were accurate, the chancellor admitted the applications into evidence, despite the Church's objection that most of the applications failed to contain all of the signatures required for payment.

Mr. Owens testified that, after he took over direct control of the project in January 2005, he experienced the same delays and interferences by the Church testified to by Mr. Sanders. Additionally, Ms. Owens testified that weather conditions prevented the paving subcontractor from completing the paving outside the church building and that the permanent certificate of occupancy was delayed because the landscaper, who was hired directly by the Church and was not under Bricks' supervision, failed to complete the landscaping necessary for a permanent certificate of occupancy. Mr. Owens further testified that, although he had taken over as project supervisor for the final three to four months of the project, after January 2005, Bricks received no money from the Church for the work under the contract, the retainage held by the bank, the remaining balance on the contractor's profit, or for any additional work performed by Bricks as project manager, even though, in a letter to Mr. Owens dated January 6, 2005, Pastor Holloway promised that the Church "will assure that those obligations [i.e., Bricks' fees] are met."

_____

[7] The contract between Bricks, Mr. Sanders, and SMS Contractors is not at issue in this appeal. Bricks and Mr. Sanders, d/b/a SMS dismissed their complaints against each other by agreed order dated August 11, 2010.

[8] Ms. Lynch testified that she sometimes used a stamp of Pastor Holloway's signature to sign the checks after receiving his express permission to do so.

Mr. Owens testified that Bricks was owed $267,834.45, including a balance of $5,700.00 that the Church allegedly failed to pay on the last application for payment, and the "balance to finish" of $262,304.45. In addition, Mr. Owens testified that Bricks was not paid all of the 11% contractor's profit, leaving a balance due of $224,655.68. Mr. Owens further testified that Bricks was due the retainage from the project in the amount of $416.378.70. Finally, Mr. Owens testified that, under the contract, Bricks was entitled to the 11% contractor's profit on any work done on the church project over the amount set out in the original contract.

Both Pastor Holloway and Mr. George testified on behalf of the Church. Pastor Holloway testified that the Church did not interfere in the selection of subcontractors, nor did it delay the project through its additions, revisions, or purchases. Pastor Holloway testified that all delays were caused by Mr. Sanders, who simply refused to complete the construction contract on time. Mr. George, likewise, testified that there were problems on the project starting six months after work commenced and that neither Mr. Sanders nor Bricks fulfilled their obligations as project manager. Mr. George did admit that additions to the contract were billed as unforeseen conditions rather than change orders.

Ms. Lynch testified regarding the pay applications from the Church, noting that the Church had made many payments on the contract. In addition, Ms. Lynch attempted to testify that the Church had already paid the contractor's profit on many of the items under the contract and for items billed as unforeseen conditions. However, the chancellor stopped Ms. Lynch and stated that all disputes regarding the contractor's 11% profit, including whether the Church had already paid a portion of the profit, were to be considered by the special master.

Based on the testimony of the witnesses, by order of December 8, 2008, the trial court found that the Church had materially breached the contract by its numerous interferences and delays. However, because there was no contract between Mr. Sanders or SMS and the Church, the chancellor dismissed Mr. Sanders' claims, including his lien, with prejudice.[9] The Court then awarded Bricks the remaining balance on the contract, $908,868.68, including the unpaid amount for construction, the retainage, and the unpaid contractor's profit on the base contract. The court also awarded prejudgment interest as required by the contract, 2.5% from January 2005. The chancellor then held that "Bricks did not receive its 11% commission on the line items in excess of the value set forth in the schedule of values,

---

[9] The chancellor was careful to point out that the dismissal of Mr. Sanders and SMS' contract claims against the Church would not affect SMS' claims for work done in addition to work under the contract, stating "[t]he Court finds that SMS, Contractors, Inc. is entitled to present to the special master its claims for labor and material provided to the Church in its capacity as a direct subcontractor of the Church."

or the extra work or additional materials provided by the Church or anyone who performed work on the project" and ruled that Bricks was entitled to its 11% contractor's profit on all additional work on the project, stating:

> With regard to the claim of Bricks for the 11% compensation for the value of the items in excess of the schedule of value line item, additional work performed by others, and the Church's direct purchases and contracts . . . as well as any payment for labor of materials that may be owed to Sanders or SMS, the Court finds that the determination of the specific calculations of damages, the documentation and evidence regarding those damages are referred to the Court's special master, Mr. James Strickland.

With regard to Bricks' claim for damages relating to the period after Mr. Sanders' employment was terminated, the chancellor stated, "Bricks is entitled to recover additional project superintendent, project manager and home office expenses for the 4 month delay period caused by the Church."

The chancellor further held that the Church failed to present any evidence to show that Bricks or Mr. Sanders committed fraud or conversion, or otherwise violated the Tennessee Consumer Protection Act. Additionally, the chancellor held that the Church, as the first party to materially breach the contract, could not recover any breach of contract damages from Bricks or Mr. Sanders. Further, the chancellor stated that "Bricks fully and properly performed its work on the Project." The chancellor also stated that "[t]he court, finding no provision for the payment of attorneys fees in the contract, declined to award attorneys fees to Bricks and reserved ruling on all discretionary costs.[10]

The special master's hearing was held over several days from December 29, 2008 to May 15, 2009. With regard to any additional work performed by SMS, Mr. Sanders testified that all work done by SMS totaled $127,196.47. Mr. Sanders also introduced, over objection, a collection of invoices constituting the work performed by SMS. These invoices contained various headers (and some were handwritten) indicating that either Mr. Sanders or SMS had performed certain work on the project. Mr. Sanders testified that Mr. George approved all the work done by SMS and Mr. George later testified that the work included in the invoices was indeed incorporated into the project. After it was pointed out that some invoices duplicated charges, Mr. Sanders reduced his claim to $120,446.47.

---

[10] The Church appealed to this Court after the entry of the December 8, 2008 judgment. However, finding that issues before the special master and discretionary costs remained to be decided, this Court dismissed the appeal for lack of a final judgment. *See Sanders et. al v. Holloway et. al*, W2008-02566-COV-R3-CV, 2009 WL 4642597 (Tenn. Ct. App. Dec. 9, 2009).

The most contentious issue during the special master's hearing, however, was what figure would be used to determine the 11% contractor's profit that the chancellor held Bricks was entitled to under the contract. Bricks took the position that the 11% profit should be based on the total cost of the completion of the project. Therefore, Mr. Owens introduced all of the checks that he claimed were part of the construction project, from the Church account, the construction account, the Bricks/BOLCC account, and a separate equipment account. Mr. Owens testified that, from Bricks' calculations, the total cost of the contract was $8,467,043.61. Subtracting the contract price already awarded to Bricks (which had the 11% contractor's profit built-in), the remaining cost of construction was $4,303,256.66. Later during the hearing, Bricks acknowledged that the total cost of construction should be reduced by amounts already paid and other items that were not actually related to the project. Accordingly, Bricks amended its calculations to state that the total cost of construction was $6,206.989.15. After subtracting the contract price, the total amount of the additional work amounted to $2,043,202.20.

The Church claimed that Bricks' calculations were erroneous because Mr. Owens was duplicating purchases and including items that were not purchased from the Bricks/BOLCC account. Accordingly, the Church's original calculation of the total cost of construction was $5,298,470.00, which would value the additional work over the original contract at $1,134,703.00. Ms. Lynch later amended the Church's calculation and testified that the actual total cost of the contract was $5,458,765.00. However, Ms. Lynch clarified that she had some questions about many of the charges that she had included in her calculations for the total cost of construction, including the kitchen equipment and cabinetry, the security system, lighting, the sound and television equipment, and telephones. According to Ms. Lynch, these items were not contemplated in the contract and, therefore, the contractor was not entitled to profit from these items that were purchased directly by the Church. Ms. Lynch did acknowledge that the Bricks would be entitled to an 11% profit from any additional compensation that the special master awarded SMS. However, Ms. Lynch again attempted to testify that the contractor's profit had been paid by the Church on some of the items that were being billed as additional work by SMS. The special master refused to hear testimony on this issue, finding that the chancellor's findings of fact made clear that Bricks had not received the 11% profit on any of the additional work performed outside the contract. With regard to the retainage, Ms. Lynch first testified that the balance of $151,189.00 in the Bricks/BOLCC account went to Bricks to pay the retainage; however Ms. Lynch later clarified that the balance was used to pay construction costs. After accounting for the balance in the Bricks/BOLCC account and the amount requested by SMS, the total cost of construction was $5,730,400.47. Thus, according to Ms. Lynch's calculations, the additional work on the church building project totaled $1,566,633.47.

Mr. Owens further testified that, relying on the original contract amounts of $5,000.00

each per month for project superintendent and project manager and $3,000.00 per month for home office expenses, Bricks was entitled to another $53,333.00 in damages for the four months that Mr. Owens served as project superintendent and manager.

There was a considerable delay in the filing of the special master's report. After a motion by the Church seeking to compel the special master's report and an order dated March 10, 2010 from the chancellor ordering the report to be filed not later than April 30, 2010, the special master's report was filed on June 4, 2010. With regard to the additional work performed by SMS, the special master, relying on the testimony of Mr. Sanders and the invoices, awarded SMS $120,446.00 for its additional work. The special master next considered the calculations by both parties for the cost of all additional items purchased or work done on the project. Although the Church disputed the total cost of construction method because it included items purchased by the Church not originally contemplated in the contract, the special master noted that Ms. Lynch testified that all items purchased by the Church were indeed incorporated into the project. Therefore, the special master found it proper to consider those items in determining Bricks' contractor's profit. Accordingly, the special master found the most accurate method to calculate Bricks' damages was the total cost of construction method using all the checks paid out for project purposes from all of the Church's bank accounts. The special master found that the total cost of construction was $6,206.989.15, including the additional work performed by SMS. Based on this figure, the special master concluded that Bricks was entitled to 11% of $2,314,837.67, or $254,632.14 plus $29,707.04 in prejudgment interest at the 2.5% rate contained in the contract. With regard to the project superintendent and manager fees and home office expenses claimed by Bricks for the months after Mr. Sanders' employment was terminated,[11] the special master relied on the testimony of Mr. Owens, which used the original contract amounts of $5,000.00 each per month for project superintendent and project manager and $3,000.00 per month for home office expenses, to award Bricks another $53,333.00 in damages.

The Church filed objections to the special master's report on July 6, 2010, arguing that: 1) the report was not supported by material evidence; 2) the special master used the total cost of construction approach despite the judge's order to consider only those items listed in the contract; 3) in determining the contractor's profit, the special master did not limit his consideration to only those items needed to complete the construction as contemplated under the contract; 4) despite the chancellor's ruling that Mr. Sanders, individually, was not entitled to any recovery, the special master did not distinguish between extra work done by Mr.

---

[11] The chancellor's findings of fact and conclusions of law did not specifically refer this issue to the special master. However, upon the testimony of Mr. Owens regarding this issue during the hearing and upon an objection by the Church, the special master concluded that the chancellor intended that the special master calculate those damages, as they were "below the line" and properly within his authority.

Sanders, as opposed to SMS; 5) the special master excluded evidence that the Church had already paid the 11% contractor's profit on some additional work performed by SMS; 6) the special master's report interprets the contract, which is a non-delegable task; 7) the special master decided issues that were beyond his authority.

On July 8, 2010, the special master filed the transcripts and evidence from the hearing. The chancellor held a hearing on Bricks' motion to confirm the special master's report on July 9, 2010. Because no objections had been timely filed, the trial court confirmed the special master's report without hearing additional evidence.[12] The trial court entered an order confirming the special master's report on July 16, 2010. On the same day, the chancellor entered an order of final judgment. The chancellor awarded SMS $120,446.47 for the additional work done outside the original contract. The chancellor then awarded Bricks contract damages of $908,868.68 plus 2.5% interest accruing from January 1, 2005; contractor's profit in the amount of $254,632.14 plus 2.5% interest accruing from January 1, 2005; and damages for the four month period that Mr. Owens served as the project superintendent in the amount of $53,333.00. In total, including the interest on the judgment from January 1, 2005 to July 15, 2010, the chancellor awarded Bricks $1,372,348.11 plus contractual post-judgment interest against the Church.

On July 21, 2010, Bricks field a motion for discretionary costs, accompanied by affidavits and invoices outlining the various expenses of the litigation. SMS filed a similar motion on August 6, 2010, again including the required affidavits and invoices. On the same day, the Church filed a motion to alter or amend arguing, *inter alia*, that: 1) the confirmation of the special master's report was in error because, at the time the Church filed its objections, no transcript or evidence had been filed by the special master, meaning that their objections were timely; 2) the final judgment contained miscalculations; 3) the final judgment failed to dispose of pending orders of the court, such as an order to attend mediation subsequent to the special master's hearing.

On August 11, 2010, the chancellor entered a consent order dismissing the claims between Mr. Sanders d/b/a/ SMS and Bricks with prejudice. On September 15, 2010 the chancellor entered an order granting both Bricks' and SMS' motions for discretionary costs, awarding $15,023.90 to Bricks and $11,046.33 to SMS.

---

[12] During oral argument, the Church argued that, under Tennessee Rule of Civil Procedure 53.04(2), it was not required to file its objections until ten days after the filing of the special master's report and the transcripts and evidence from the special master's hearing. However, this argument was not presented in the Church's brief. This argument is waived. *See* **Fite v. State, Bd. of Paroles**, 925 S.W.2d 543 (Tenn. Ct. App. 1996).

On April 27, 2011, the chancellor entered an order styled "Order Denying Motion to Alter, Amend, or Set Aside Judgment Based Upon Tennessee Rules of Civil Procedure 59 and 60, Order Modifying special master's Report and Final Order of Judgment Date July 16, 2010 and Order Denying All Claims Not Theretofore Ruled Upon by this Court by Previous Order." Therein, the chancellor reduced the total cost of construction by $23,752.00 to correct errors in the special master's report, which reduced Bricks' total recovery to $1,368,906.69. The chancellor further stated that "any claims asserted by the parties in this action not heretofore specifically ruled upon by orders of this Court are hereby denied and dismissed with prejudice." Otherwise, the final judgment dated July 16, 2010 remained intact.

The Church appeals.

## II. Issues Presented

The Church raises a number of issues on appeal, which we restate as follows:

1. Whether the trial court erred excluding evidence of the Church's damages as a discovery sanction?
2. Whether the trial court erred in referring damages issues to a special master?
3. Whether the trial court erred in its evidentiary rulings?
4. Whether the trial court erred in determining that the Church materially breached the contract?
5. Whether the trial court erred in its interpretation of the contract and calculation of damages?
6. Whether the special master exceeded his authority?
7. Whether the trial court erred in awarding discretionary costs to Bricks and Sanders?

## III. Analysis

### A. Discovery Sanctions

As its first issue, the Church claims that the sanction imposed on the Church for its failure to respond to discovery was in error. It is well-settled in Tennessee that the trial court has wide discretion over discovery and the imposition of sanctions for discovery abuse. *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn. 1992); *Mercer v. Vanderbilt University, Inc.*, 134 S.W.3d 121, 133 (Tenn. 2004) ("Trial courts have wide discretion to determine appropriate sanctions to be imposed.") "The decision of the trial court in discovery matters will not be reversed on appeal unless a clear abuse of discretion is demonstrated." *Paine v. Ramsey*, 591 S.W.2d 434, 436 (Tenn. 1979). An abuse of discretion occurs when "the trial

court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence." ***Id.***

In this case, Bricks propounded interrogatories on the Church on August 9, 2005. Even after one discovery issue was sent to the special master, who essentially ordered the Church to comply with Bricks' requests, the Church had still not satisfactorily responded to discovery by February 15, 2007. In addition, Bricks' asked the Church to designate a Rule 30.02(6) corporate representative specifically to discuss the Church's damages claims. However, in her deposition, the Church's representative repeatedly stated that she was not the appropriate person to testify as to the Church's damages. After a motion to compel by Bricks, the chancellor stated that "[if] there's no testimony about damages, if you don't have somebody who can specify what damages are, then there won't be any testimony about damages. But whatever the testimony is about damages in that deposition is what the testimony of damages is going to be at trial." The chancellor further required that all people that could testify regarding damages and "what you say the damages are" were to be designated within ten days. The chancellor then entered an order memorializing his ruling and making clear that, if the Church fails to designate a Rule 30.02(6) representative for damages or fails to reveal the specific names of those expected to testify about damages at trial as well as the substance of that testimony by July 9, 2007, all evidence regarding damages (other than that which has been specifically revealed through discovery on or before July 9, 2007) will be excluded. The Church failed to respond by July 9, 2010. When they did respond, the Church again failed to specifically name a number of witnesses that the Church expected to call to testify regarding damages and failed to specify the substance of even a single witness' expected testimony.

The trial court is directed to consider a number of factors to determine what sanction is appropriate in a particular situation. The Tennessee Supreme Court in ***Lyle v. Exxon Corp.***, 746 S.W.2d 694 (Tenn. 1988), discussed the appropriate considerations in the situation where one party seeks to exclude the testimony of a witness, stating:

> In determining the appropriate sanction the trial judge should consider:
>
> 1. The explanation given for the failure to name the witness;
> 2. The importance of the testimony of the witness;
> 3. The need for time to prepare to meet the testimony; and
> 4. The possibility of a continuance.

***Id.*** at 703 (citing ***Strickland v. Strickland***, 618 S.W.2d 496, 501 (Tenn. Ct. App. 1981)). In this case, the only explanation for the failure to specifically name the witnesses and set out the basis of their testimony was the trial court's delay in entering the order and the fact that

the court's oral ruling did not make clear that it applied to both the representative witness and all non-representative witnesses. However, the order was entered five days prior to the deadline given by the trial court and this discovery had been pending (and the subject of a prior motion to compel) for nearly two years. Additionally, the testimony of all damages-related witnesses is exceedingly important because Bricks and SMS cannot defend against the Church's damages claims without a calculation of their damages, which the Church repeatedly refused to provide. Due to the fact that the discovery centered around the Church's damages, both Bricks and SMS would need time to prepare for that testimony. Finally, due to the nearly two year pendency of these discovery requests, the chancellor would have reasonably been reluctant to prolong the case again through a continuance. Based on all these considerations, we conclude that the chancellor did not abuse his discretion in excluding this evidence.

## B. Referral to a Special Master

The Church argues that the trial court erred in bifurcating the trial into base damages and additional damages after the start of trial and sending the additional damages issues to a special master. Specifically, the Church argues that: 1) it was not proper to refer these issues to the special master; 2) the bifurcation was confusing and prejudicial to the Church because the Church relied on the chancellor's earlier ruling that all damages issues would be decided by the special master; and 3) the bifurcation prevented the Church from presenting evidence supporting its claims for fraud, conversion, and violations of the Tennessee Consumer Protection Act.

Tennessee Rule of Civil Procedure 53.01 allows trial courts to refer matters to special masters. *See* Tenn. R. Civ. P. 53.01 ("The court in which any action is pending may appoint a special master therein."). The trial court, however, may not refer all matters to the special master. It is well-settled in Tennessee that:

> The main issues of a controversy and the principles on which these issues are to be adjudicated must be determined by the trial court. *State v. Bolt*, 130 Tenn. 212, 169 S.W. 761, 762 ([Tenn.] 1914); *Ingram v. Stein*, 23 Tenn. App. 105, 126 S.W.2d 891, 892 ([Tenn.] 1938). Collateral, subordinate, and incidental issues and the ascertainment of ancillary facts are matters properly referred to a special master. *Ingram*, 126 S.W.2d at 892.

*Dockery v. Dockery*, 2009 WL 3486662, at *3 (Tenn. Ct. App. Oct. 29, 2009) (quoting *Archer v. Archer*, 907 S.W.2d 412, 415–16 (Tenn. Ct. App. 1995)). The practice of referring damages issues to a special master is common in Tennessee. *See Clear Channel Outdoor, Inc. v. A Quality, Inc.*, No. W2007-00213-COA-R3-CV, 2008 WL 2901345, at *7 (Tenn.

Ct. App. July 29, 2008) (citing a number of cases where damages issues were referred to a special master). Additionally, issues of accounting are properly referred to a special master. *See **Hopkins v. First Tennessee Nat. Bank***, 560 S.W.2d 916, 917 (Tenn. 1977).

The decision to a refer a matter to a special master is reviewed under an abuse of discretion standard. ***Owens v. Owens***, 241 S.W.3d 478, 790 (Tenn. Ct. App. 2007). A trial court abuses its discretion when it has applied an incorrect legal standard or has reached a decision which is against logic or reasoning that caused an injustice to the party complaining. ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001). Under the abuse of discretion standard, the trial court's decision "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." ***Camp v. Camp***, No. W2010-01037,COA-R3-CV, 2011 WL 2567542, at *5 (Tenn. Ct. App. June 29, 2011) (quoting ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001)).

The abuse of discretion standard involves "a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal." ***Lee Medical, Inc. v. Beecher***, 312 S.W.3d 515, 524 (Tenn. 2010) (citing ***Beard v. Bd. of Prof'l Responsibility***, 288 S.W.3d 838, 860 (Tenn. 2009)). The standard "reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives." ***Lee Medical, Inc.***, 312 S.W.3d at 524 (citing ***Overstreet v. Shoney's, Inc.***, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999)). Accordingly, appellate courts are not permitted to "second guess" the trial court's determinations or to substitute their judgment for that of the trial court. ***Lee Medical, Inc.***, 312 S.W.3d at 524 (citing ***White v. Vanderbilt Univ.***, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)). "The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny." ***Lee Medical, Inc.***, 312 S.W.3d at 524 (citing ***Boyd v. Comdata Network, Inc.***, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002)). Specifically in the case of a referral to a special master, the trial court's discretion must be exercised with the following considerations in mind:

> [T]he interests of justice will warrant a bifurcation of the issues in only the most exceptional cases and upon a strong showing of necessity. In making its decision the trial court should consider the possibility of juror confusion, the risk of prejudice to either party, and the needs of judicial efficiency. Above all, the issues at trial must not be bifurcated unless the issue to be tried is so distinct and separable from the others that a trial of it alone may be had without injustice.

***Ennix v. Clay***, 703 S.W.2d 137, 139 (Tenn. 1986) (citing ***Gasoline Prods. Co., Inc. v. Champlin Ref. Co.***, 283 U.S. 494, 500 (1931)).

This case involved a contract that provided for an 11% contractor's profit on work performed on the construction project that was in excess of the contract price. In order to determine those items that were paid by the Church in excess of the contract price, the parties presented over 600 pages of bank records. The special master's hearing took six days, over the course of several months, to complete. Accordingly, judicial efficiency was certainly met by referring the non-contract damages to the special master.

The Church argues that it was prejudiced by the chancellor's decision to decide the base contract damages and only refer those damages in excess of the original contract to the special master after already ruling that all damages issues would be referred to the special master. According to the Church, its failure to bring necessary exhibits to trial concerning the base damages under the contract was the result of its reliance on the chancellor's earlier ruling. We note that the decision to bifurcate a trial even after the trial has begun is usually not an abuse of discretion. *See Lamar Advertising Co. v. By-Pass Partners*, 313 S.W.3d 779, 789 (Tenn. Ct. App. 2009) (citing *Saxion v. Titan–C–Manufacturing, Inc.*, 86 F.3d 553, 556 (6th Cir. 1996)). Indeed, from our review of the transcript, after the chancellor modified his ruling, he recessed in order to allow counsel for the Church to obtain the exhibits that were not brought to trial and only heard one witness that day to allow the Church all weekend to prepare for the following week of trial. In addition, no evidence was presented between the time that the chancellor made his first ruling that he would not decide any damages issues and his modification of that ruling. Under these circumstances, we cannot say that the Church was prejudiced by the chancellor's modification of his earlier ruling.

The Church also argues that the bifurcation prevented the Church from presenting evidence of fraud, conversion, or violations of the Tennessee Consumer Protection Act. However, from our review of the record of both the trial before the chancellor and the hearing before the special master, we find no indication that either Bricks or SMS objected, on the basis of the chancellor's bifurcation of contract and non-contract damages, to the introduction of any evidence introduced by the Church to support these claims. Accordingly, this argument is without merit.

The Church finally argues that the bifurcation created confusion regarding what issues were properly before the chancellor and what issues were properly before the special master. The Church argues that it was prejudiced because it was unable to present certain evidence due to this confusion, including evidence of its own damages due to the interest accruing on the construction loan. The Church argues that this confusion makes the referral to the special master an abuse of discretion under *Ennix v. Clay*, *supra*. We first note, however, that the Tennessee Supreme Court in *Ennix* was concerned with jury confusion, rather than with the confusion of the parties. In addition, the chancellor's refusal to hear evidence of the Church's damages due to the delay was proper. The church's damages for Bricks' alleged delay are

non-contract damages because these damages are not specifically provided for in the contract; the chancellor had already ruled that all damages other than base contract damages were to be determined by the special master. Furthermore, because contract damages are collateral to the determination of which party breached the contract, they are the type of matter properly referred to the special master. *See Clear Channel Outdoor, Inc. v. A Quality, Inc.*, No. W2007-00213-COA-R3-CV, 2008 WL 2901345, at *7 (Tenn. Ct. App. July 29, 2008); *Hopkins v. First Tennessee Nat. Bank*, 560 S.W.2d 916, 917 (Tenn. 1977). The Church points out that the chancellor did hear evidence, and subsequently awarded Bricks interest on their judgment at a rate of 2.5%; however, this award was wholly compatible with the chancellor's prior decision to retain only base contract damages for determination, as a 2.5% interest rate on any payments due under the contract is specifically provided for in the contract. Accordingly, the Church has not shown that the referral to the special master was indeed an abuse of discretion.[13]

## C. Evidentiary Rulings

The Church also takes issue with the chancellor's allowing the unsigned pay applications evidencing work done on the project to be admitted. The Tennessee Supreme Court in *Otis v. Cambridge Mutual Fire Insurance Co.*, 850 S.W.2d 439 (Tenn. 1992), outlined the appellate review of evidentiary rulings:

> In Tennessee admissibility of evidence is within the sound discretion of the trial judge. When arriving at a determination to admit or exclude even that evidence which is considered relevant trial courts are generally accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of abuse of discretion.

*Id.* at 442.

First, the Church argues that the pay applications are irrelevant. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

---

[13] We also note that the Church takes issue with the chancellor's refusal to hear evidence that the Church paid the 11% contractor's profit on some additional work done on the project. In this case, the trial court made a specific finding, in its December 8, 2008 findings of fact and conclusions of law, that Bricks had not been paid any of the 11% contractor's commission on additional work performed by SMS. Accordingly, the argument that the Church in fact paid the contractor's profit is properly couched as an argument that the chancellor's finding was not supported by the preponderance of the evidence, rather than as an argument that the trial court abused its discretion in referring the additional damages to the special master. We will discuss this issue in Section E.

evidence." Tenn. R. Evid. 401. In this case, the pay applications concern the work done on the church construction project and relate to both the issue of which party breached the contract and the issue of what balance is owed on the contract.

The Church next argues that the prejudicial effect of the pay applications outweighs the probative value. Once evidence is deemed relevant, "the court should exclude the evidence if its probative value is substantially outweighed by its prejudicial effect." Tenn. R. Evid. 403; *see also State v. Watson*, 227 S.W.3d 622 (Tenn. Crim. App. 2006). However, excluding relevant evidence on the grounds of undue prejudice is "an extraordinary remedy that should be used sparingly, and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999). The Church offers no explanation as to the prejudicial effect of the pay applications. Therefore, the Church has failed to meet its burden to show prejudice.

The Church also argues that the admission of the pay applications violates the best evidence rule. Tennessee Rule of Evidence 1002 requires that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required." The Church argues that these applications are not the original copies of the pay applications because they do not contain the signatures of all parties required for payment. Bricks, in its brief, argues that these are allowable duplicates of the originals[14] and that the documents came from a discovery request to the Church, which is the only party with access to the originals. However, from our thorough review of the record, it appears that the Church failed to object to the admission of this evidence on the basis of the best evidence rule.[15] Failure to object during the trial constitutes a waiver of the issue on appeal. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Accordingly, the Church's argument that the admission of this evidence violates the best evidence rule is waived.

The Church finally argues that the pay applications were not properly authenticated because they were not signed by all the required parties. All evidence is required to be authenticated prior to admission. Tenn. R. Evid. 901(a). Authentication "is satisfied by

---

[14] Tennessee Rule of Evidence 1003 states that "[a] duplicate is admissible to the same extent as an original unless a genuine question is raised as to the authenticity of the original."

[15] The Church made best evidence objections to other evidence submitted by Bricks and SMS. However, the only objections made to the pay applications were for relevancy and lack of authentication.

evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." *Id.* One method of authentication is by "[t]estimony of [w]itness [w]ith [k]nowledge." *Id.* at (b). In this case, the chancellor admitted the evidence based on the testimony of both Mr. Sanders and Mr. Owens that the applications submitted to the court were the applications that were submitted to the Church for payment. Indeed, in later testimony, both Mr. George and Ms. Lynch testified that they recognized the applications for payment. In this situation, we conclude that the chancellor did not abuse his discretion in admitting the pay applications, as the applications were relevant, not unfairly prejudicial, and authenticated by several witnesses with knowledge.

### D. Breach of Contract

The Church argues that the trial court erred in finding that the Church materially breached the construction contract with Bricks. The interpretation of a contract is a question of law. *Guiliano v. CLEO, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, the trial court's interpretation of a contractual document is not entitled to a presumption of correctness on appeal. *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). However, the determination of whether a breach has occurred is a question of fact. *Carter v. Krueger*, 916 S.W.2d 932, 934-35 (Tenn. Ct. App.1995) ("This is a matter of fact which is properly addressed to the trier of fact."). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999).

The trial court found that several elements contributed to the delay of the contract, none of which were attributable to Bricks or SMS. These reasons for delay included: 1) the defective workmanship on the part of the previous contractor; 2) interference by the Church in the selection of subcontractors; 3) the Church's failure to timely buy or perform work allocated to the Church: 4) the Church's numerous requests for changes and upgrades to the project; and 5) the Church's failure to perform certain administrative tasks such as placing the deposit for the baptistry, purchasing improper fixtures, and failing to complete and return a credit application in order to purchase materials for the stadium seating in the sanctuary. Finding that the delay of the construction was due to the Church's actions, the trial court concluded that the Church materially breached the contract "by its failure to fulfill its contractual responsibilities; by its unreasonable interference and hinderance of the work performed by Bricks; by its failure to coordinate the activities of its separate subcontractors; and by its material changes in the scope of work, all of which, interfered, hindered and delayed Bricks' progress on the Project."

In support of its contention that the trial court's ruling was error, the Church argues

that Bricks, not the Church, breached the construction contract by failing to complete the project on time and by failing to properly supervise Mr. Sanders during the construction project. It is well settled in Tennessee that "[a] party's failure to complete a construction project within a time for completion does not constitute material breach absent a provision making time of the essence." ***Madden Phillips Const., Inc. v. GGAT Development Corp.***, 315 S.W.3d 800, 818 (Tenn. Ct. App. 2009) (quoting ***Shepherd v. Perkins Builders***, 968 S.W.2d 832, 833 (Tenn. Ct. App. 1998). "The existence of an agreement that 'time is of the essence'" can be shown by "'stipulation, a manifestation of intention from the contract or subject matter involved, or an implication from the nature of the contract or circumstances of the case.'" ***Madden***, 315 S.W.3d at 818 (quoting ***Commerce St. Co. v. Goodyear Tire & Rubber Co.***, 215 S.W.2d 4, 11 (Tenn. 1948)). "Generally, time is not of the essence of a building and construction contract." ***Shepherd***, 968 S.W.2d at 833 (citation omitted). Thus, a party to a construction contract will not establish that time is of the essence solely by showing that a contract contained a time or date for completion and nothing more. ***Madden***, 315 S.W.3d at 818.

In this case, the construction contract contained a date of completion, 365 days from the date of commencement. It is undisputed that the construction project was not completed on this date. However, the contract also contains a provision that specifically states that the contract amount applies only to a twelve-month period and that "[c]ontractor will be paid for additional time in the event the construction time exceeds the 12 months through no fault of the contractor." The express terms of the contract specifically contemplated that this construction project could take over twelve months to complete. As such, we conclude that this contract did not make time of the essence. Accordingly, the mere fact that construction was not completed twelve months from commencement will not constitute a material breach of the contract.

The Church's argument that Bricks breached the contract by failing to properly supervise Mr. Sanders is also without merit. The Church argues that the trial court failed to make a finding of fact regarding whether Bricks was negligent in its supervision of Mr. Sanders as the project manager and that this Court should review the record *de novo* to determine where the preponderance of the evidence lies. *See* ***Forrest Construction Co., L.L.C. v. Laughlin***, 337 S.W.3d 211, 220 (Tenn. App. Ct. 2009) (citing ***Ganzevoort v. Russell***, 949 S.W.2d 293, 296 (Tenn. 1997) ("[I]f the trial judge has not made a specific finding of fact on a particular matter, we will review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness.")). However, our review of the chancellor's findings of fact reveals that the chancellor did find that "Bricks fully and properly performed its work on the Project." Therefore, this Court may only overturn the chancellor's finding if the evidence preponderates against the finding that Bricks properly supervised Mr. Sanders. Turning to that question, Mr. George testified that,

although progress was slow, the project "proceeded normally . . . [and] satisfactorily" for the first six months. After the first six months, Mr. George testified that there were problems with the grading around the building and with cleanup inside the church. Mr. George also testified that, while he could not say specifically how often he saw Mr. Owens on the site, it was "not very often." However, Mr. Sanders testified that the project was progressing normally except for the delays caused by the Church's deficient performance. Importantly, even Mr. George assured Pastor Holloway that the construction project was moving smoothly as late as Fall 2005. Mr. Owens also testified that, while he was not at the project every day, he regularly went to the project and was aware of the work being done through the pay applications. In addition, Mr. George testified that there were several items left to be done after the project was completed. However, he also testified that Bricks had returned to fix certain parts of the project when requested. Considering all the evidence, we cannot conclude that the evidence preponderates against the chancellor's finding that Bricks fully performed its obligations on the contract.

The Church also argues that the evidence preponderates against the chancellor's finding that the Church caused the delays in the construction contract. The testimony of Mr. George shows that the Church did not delay in performing tasks, such as placing the flooring and the pews in the sanctuary, because the Church was required to wait to place the floor until the ceiling was finished. However, other testimony shows that the ceiling was delayed because the either the Church or its out-of-town decorator took several weeks to decide what type of ceiling tile to use. The Church also points out that Mr. George testified that the Church did not "select, influence, or interfere" with the selection of subcontractors; however, testimony from other witnesses shows that the Church had considerable influence over the selection of subcontractors, employing several of their own parishioners to do much of the work. When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the manner and demeanor of the witnesses while testifying is in a far better position than this Court to decide those issues. *See **McCaleb v. Saturn Corp**.*, 910 S.W.2d 412, 415 (Tenn.1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App.1997). "If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary." ***Heffington v. Heffington,*** No. M2009-00434-COA-R3-CV, 2010 WL 623629 (Tenn. Ct. App. Feb. 19, 2010). After a careful review of the record, we conclude that the evidence does not preponderate against the trial court's finding that the delays in the project were attributable to the Church.

Having determined that the delays in the project were attributable to the Church and that Bricks properly performed its duties under the contract, the trial court went on to conclude that the Church's interference, failure to perform administrative tasks necessary to keep the project on schedule, and failure to pay the installment payments constituted material

breaches of the contract. The chancellor found that the delays caused by the Church prevented Bricks from performing its obligations under the contract. "A breach of the contract takes place when the promisee disables the promisor from performing." **Ault v. Dustin**, 45 S.W. 981 (Tenn. 1898). Relying upon **Foster & Creighton Co. v. Wilson Contracting Co.**, Inc., 579 S.W.2d 422 (Tenn. Ct. App. 1978), Bricks argues that the Church's actions in delaying the project amount to a material breach.  In **Foster**, this Court held that "[i]f the contract requires the subcontractor to complete performance by a certain date, then the subcontractor cannot be held liable for failure to complete on time unless he has been afforded a reasonable opportunity to perform, and, in a proper case, may recover damages for denial of such opportunity." According to Bricks, the holding in **Foster** applies equally to a situation where the owner of a property is delaying the performance on the contract. The law in **Foster** stems from the duty of good faith and fair dealing implied in every contract. *See* **Madden Phillips Const., Inc. v. GGAT Development Corp.**, 315 S.W.3d 800m, (Tenn. Ct. App. 2009) (noting that the duty implied in **Foster** stems from the duty of good faith). This Court, in **German v. Ford**, 300 S.W.3d 692, 706 (Tenn. Ct. App. 2009), explained:

> [E]very contract imposes on the parties a duty of good faith and fair dealing in its performance. Restatement (Second) of Contracts § 205 (1981). For example, every contract includes an implied condition that one party will not prevent performance by the other party. *See* **Moody Realty Co. v. Huestis**, 237 S.W.3d 666, 678 (Tenn. Ct. App. 2007) (citation omitted). This is easily seen where the prevention of the other party's performance takes the form of active hindrance:
>
> > In any kind of contract, if the right of one party to compensation is conditional upon the rendition of some service or other performance by him . . . , it is nearly always a breach of contract for the other party to act so as to prevent . . . the performance of the condition. It is a breach of duty, only because the court finds a promise by implication not to prevent or hinder.
>
> * * *
>
> Where the plaintiff's performance has been wrongfully prevented or hindered by the conduct of the defendant, "[o]nly the law of the jungle would say that plaintiff's failure to perform should not be excused." [Joseph M.] Perillo, [Calamari and Perillo on Contracts], § 11.28 [(5th ed. 2003)].

Based on the duty of good faith, this Court has recognized that each party to a contract is "under an implied obligation to restrain from doing any act that would delay or prevent the

other party's performance of the contract" and that "[e]ach party has the right to proceed free of hindrance by the other party." ***ACG, Inc. v. Southeast Elevator, Inc.***, 912 S.W.2d 163, 168 (Tenn. Ct. App. 1995).

Bricks also argues that the Church materially breached the contract by failing to timely pay Bricks the balance of the project upon completion. The evidence shows that the Church failed to pay Bricks after January 2004; even Ms. Lynch agreed that the Church did not pay any pay applications after Application 15. It is well settled that the failure to make progress payments on a construction contract constitutes a material breach of the contract. The Tennessee Supreme Court, in ***Rhea v. Marko Construction Co.***, 652 S.W.2d 332 (Tenn. 1983), stated:

> The failure to pay an instalment [sic] of the contract price as provided in a building or construction contract is a substantial breach of the contract, and gives the contractor the right to consider the contract at an end, to cease work, and to recover the value of the work already performed.

***Id.*** at 333 (citing 13 Am. Jur. 2d Building and Construction Contracts § 102 (1964)). The Church argues that it did not refuse to pay Bricks. Rather, because this litigation commenced shortly after Bricks left the project and the project was not complete until after the litigation commenced, the Church argues that it was justified in withholding the balance on the contract, including the unpaid installment payments. The contract provides that final payment is due when the "[c]ontractor has fully performed Contract . . . [and] final certificate of payment is issued by the Architect." However, the evidence shows that the Church stopped making progress payments in January of 2005, although the Church assured Mr. Owens upon taking over direct supervision of the project that all the Church's obligations would be met. Progress payments are required under the contract. While the Church argues that full payment was not due until completion of the project, which would not occur until payment was authorized by the architect, the contract requires that all progress payment applications are to be paid "not later than the 10th day of the next month" after receiving the pay application. Mr. Owens testified, and Ms. Lynch agreed, that Bricks was not paid any pay application after January 2005, though the record contains four outstanding pay applications. Although the Church disputes the validity of these pay applications because they are not signed by representatives of the Church as required for payment, Mr. Owens testified that the pay applications accurately reflect the time and money Bricks spent on the project. Additionally, the Church offers no evidence that any of the work reflected in the applications was not done on the project. Failure to pay an installment payment is a material breach that entitles the non-breaching party to stop work and sue the breaching party for work already performed. *See **Rhea***, 652 S.W.2d at 333. Because the weight of the evidence shows that the contract was substantially performed in April of 2005, Bricks is entitled to sue for the entire

contract amount plus the 11% contractor's profit contained in the contract. Based on the foregoing, we conclude that the evidence does not preponderate against the trial court's finding that the Church materially breached the contract by interfering in the project and by failing to pay the installment payments.

### E. Calculation of Damages

The Church next argues that the chancellor erred in interpreting the construction contract and, based on that error, miscalculated Bricks' damages. As discussed above, the interpretation of a contract is a question of law, which we will review *de novo* with no presumption of correctness. *Guiliano v. CLEO, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). It is well-settled that the intent of the contracting parties at the time of executing the agreement should govern. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). The court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Guiliano*, 995 S.W.2d at 95; *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). Where the language of the contract is clear and unambiguous, its literal meaning controls the outcome of contract disputes. *Planters Gin Co.*, 78 S.W.3d at 890. Where a contractual provision is ambiguous, that is, susceptible to more than one reasonable interpretation, and the parties' intent cannot be determined by a literal interpretation of the language or pertinent rules of construction, the legal meaning of the contract becomes a question of fact. *Id.*

The Church first argues that the trial court incorrectly awarded the 11% contractor's profit on the original contract items and the retainage as a separate amount beyond the original contract. The determination of the proper measure of damages is a question of law, but "the amount of damages to be awarded in a particular case is essentially a fact question." *Beaty v. McGraw*, 15 S.W.3d 819, 827 (Tenn. Ct. App.1998). It is undisputed that the contract price was $4,163,786.95. Mr. Owens testified that, after all payments made by the Church were subtracted from the contract price, Bricks was owed $908,868.68 on the base contract. The trial court apparently credited Mr. Owens' testimony in awarding Bricks $908,868.68. When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the manner and demeanor of the witnesses while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp*., 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App.1997). "If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary." *Heffington v. Heffington,* No. M2009-00434-COA-R3-CV, 2010 WL 623629 (Tenn. Ct. App. Feb. 19, 2010). Nothing in the record preponderates against the trial court's finding that Bricks was entitled to

$908,868.68 in contract damages.

The Church next argues that the chancellor erred in concluding that the 11% contractor's fee includes all work performed on the church building, including items that were not originally set forth in the schedule of values contained in the construction contract. The provisions of the contract at issue state:

> In the event that the Schedule of Values submitted by the Breath of Life Christian Church is insufficient in any item or if required items are not there listed, and then the owner shall be required to pay those costs and Bricks, Inc. shall be entitled to receive 11% of the increased cost of those items.

> * * *

> The Church may at its election purchase materials, fixtures, and equipment in order to avoid payment of sales tax and thereby reduce its costs. The Church's consultant must receive prior notification and approve any work in excess of this shown on Schedule of Values (Exhibit "E") If such work is unapproved by the Church's consultant, it will not be performed by the contractor.

> * * *

> All additional work not reflected and/or included in the Schedule of Values (exhibit "E") attached hereto, which is requested or required by the owner to complete the overall project, will be billed at a cost plus 11% commission and submitted to the Church's representative for review and verifications.

The contract clearly and unambiguously states that the 11% contractor's profit pertains to "[a]ll additional work . . . requested or required . . . to complete the overall project." This language clearly shows that Bricks was entitled to its 11% commission on "all" work done to complete the "overall" project of building the church. In addition, the only reference to the reduction in cost is the provision concerning the Church's direct purchase of "materials, fixtures, and equipment" to eliminate any sales tax. Further, Ms. Lynch, the representative of the Church, agreed that the contract provided that Bricks would receive the 11% contractor's profit on "any additional work that was performed directly from the [C]hurch or by the [C]hurch." We conclude that the chancellor did not err in holding that the plain language of this contract requires the Church to pay Bricks the 11% contractor's profit on all additional work, materials, fixtures, or equipment that the Church used to complete the overall project.

The Church also argues that the chancellor erred in finding that additional work had actually been performed on the project, which would entitle Bricks to additional contractor's profit. The Church points out that the contract requires "change orders" approved by the owner, architect, and contractor prior to any different or additional work being performed on the project and any additional costs being taxed to the Church. While the contract at issue does require change orders, the evidence shows that additional or different work was performed as "unforeseen conditions" at the request of Mr. George. Additionally, the record contains invoices from Mr. Sanders that billed for unforeseen conditions. Ms. Lynch disputed the amounts of some of these invoices due to an incorrect calculation of the contractor's profit; however, prior to this litigation, neither Ms. Lynch or any one else from the Church questioned whether it was proper for Mr. Sanders to bill additional work as "unforeseen conditions." Finally, Mr. Sanders and Mr. George both testified that all work billed as "unforeseen conditions" was approved to be done and incorporated into the project. From the totality of the circumstances, we cannot conclude that the evidence preponderates against the finding that there was actually additional work performed on the project, on which Bricks is entitled to calculate its contractor's profit.

The Church finally argues that the chancellor erred in concluding that Bricks had not been paid any of the 11% contractor's profit on unforeseen conditions/additional work, which in turn prevented the special master from considering any evidence that the contractor's profit had indeed been paid. We agree. At trial, the Church tried to introduce evidence through Ms. Lynch that the Church had in fact paid the 11% contractor's profit on some items marked as "unforeseen conditions." When asked the relevance of the document, counsel for the Church stated that "there is a question as to whether or not Bricks received 11 percent, even on these items." The trial court did not allow the evidence, stating "I understand, but that's for the special master . . . I'm not hearing that. You can go through this, and you can take all this up with the special master, but that's not what we're hearing here." After the conclusion of trial, however, the trial court's findings of fact stated that "Bricks did not receive its 11% commission on the line items in excess of the value set forth in the schedule of values, or the extra work or additional materials provided by the Church or anyone who performed work on the project . . . ." Later, when the Church again tried to introduce evidence that the Church had in fact paid the 11% contractor's profit during the special master's hearing, the special master concluded that the issue had already been decided by the chancellor and would not allow any testimony on the issue, stating:

So, the [chancellor] has [said] "Bricks did not receive its 11 percent on line items in excess which were in the schedule or for the extra work for additional materials." So, I think the Court has already told me that they have not gotten any. You say, apparently, they have, but I'm sticking with this. So, first, I'm going to backtrack again on my original ruling. I'm not going to allow anymore

-30-

testimony on what 11 percent has already been paid because the Court told me not to.

While we are mindful that the trial court's factual determinations are afforded a presumption of correctness on appeal, when there is no evidence in the record to support the trial court's finding, we must conclude that the trial court erred. ***Conroy v. Carter Automotive Products Corp.***, 640 S.W.2d 831, 831 (Tenn. 1982) (noting that "if there is no material evidence in the record to support the factual findings of the trial judge, it is our duty to reverse "). In this case, the chancellor found that Bricks had not been paid any of the 11% contractor's profit, even though he had referred that issue to the special master. Accordingly, we vacate that finding and remand to the chancellor for consideration of any evidence showing that the Church paid the 11% contractor's profit on any additional work.

## F. Special Master's Report

The Church next argues that the special master erred in its calculation of damages. The Church agrees that "[a] concurrent finding of fact by a Master and a trial court is conclusive on appeal, except where the finding is on an issue not appropriate for referral, where it is based on an error of law or a mixed question of fact and law, or where the factual finding is not based on material evidence." ***Farmer v. First Tennessee Bank, N.A.***, No. W2006-02016-COA-R3-CV, 2008 WL 2115394, at *3 (Tenn. Ct. App. May 20, 2008) (quoting ***Aussenberg v. Kramer***, 944 S.W.2d 367, 370 (Tenn. Ct. App. 1996)). These findings are "essentially engraved in stone." ***In re Ladd***, No. M2005-02089-COA-R3-CV, 2007 WL 1259211, at *4 (Tenn. App. Ct. April 30, 2007).

Having already determined that the damages issue in this case was appropriate for referral, we turn next to the Church's argument that the special master erred in using the "total cost of construction" method for determining the amount to which Bricks was entitled as an 11% contractor's profit. The Church cites ***Forrest Construction Co. Laughlin***, 337 S.W.3d 211 (Tenn. Ct. App. 2009) for the proposition that "in a cost-plus contract there is an implicit understanding between the parties that the cost must be reasonable and proper. The contractor is under a duty of itemizing each and every expenditure made by him on the job and where the owner denies being indebted to the contractor, the latter has the burden of proving each and every item of expense in connection with the job." ***Id.*** at 223. However, the facts in ***Forrest*** are not analogous to the present situation. In ***Forrest***, the plaintiff-contractor sought compensation for the work that the plaintiff-contractor alleged he had performed on the contract. In the situation before the special master, Bricks sought only the 11% commission on all the Church's project-related expenditures. The Church did not deny that the expenditures that it made on the project were reasonable and necessary to complete the project, only that the expenditures were not covered in the original schedule of values; indeed

-31-

the Church had already paid for these expenditures and the evidence of the expenditures was produced by the Church during discovery. Further, Mr. George, the project representative for the Church, testified that, in nearly every situation, the additional work was incorporated into the project; Mr. George was also unable to definitively state that any additional work was not incorporated into the project. In this situation, we conclude that the special master did not base his calculations on an error of law that would invalidate those findings.

The Church next argues that the special master erred in awarding damages to SMS for extra work done as a direct subcontractor to the project without specifically discerning whether the damages went to SMS or Mr. Sanders individually. The testimony during the special master's hearing, however, showed that Mr. Sanders was the representative for SMS and that work done by Mr. Sanders as a direct subcontractor was done in his official capacity as representative of SMS. Accordingly, this finding on the part of the special master is not based on an error of law and is supported by material evidence.

The Church further argues that the special master exceeded his authority in awarding delay damages to the Church for the four months that Mr. Owens served as project superintendent because the chancellor's findings of fact did not specifically refer the issue of the calculation of delay damages to the special master. Indeed, the chancellor's order states only that "Bricks is entitled to recover additional project superintendent, project manager and home office expenses for the 4 month delay period caused by the Church," and does not specifically refer this matter to the special master. Although this matter may not be entitled to the heightened standard afforded findings concurred in by the trial court, we nevertheless conclude that the chancellor did not err in awarding delay damages to Bricks. The chancellor clearly found that Bricks is entitled to project superintendent fees, project manager fees and home office expenses due to the Church's delays. The evidence does not preponderate against this finding. The chancellor did err, however, in his calculation of Bricks' damages. The chancellor found that Bricks was entitled to delay damages for the four months Mr. Owens served as project superintendent/manager on the project. However, the testimony of Mr. Owens at trial was that he was project superintendent/manager for "[j]ust a tad over three months. I'd say for all practical purposes three months." The amounts for each fee are laid out specifically in the contract—$5,000 each per month for project manager and superintendent fees and $3,000.00 per month for home office expenses. There was no testimony from Mr. Owens during the trial before the chancellor that Bricks was entitled to more than this amount. Accordingly, the delay damages for the three months that Mr. Owens served as project superintendent/manager are $39,000.00. We, therefore, amend the trial court's judgment to reflect that Bricks is awarded $39,000.00 for delay damages, rather than the $53,333.00 originally awarded.

## G. Discretionary Costs

Next, the Church argues that the trial court erred in awarding discretionary costs to Bricks and SMS. Discretionary costs are allowed under Tennessee Rule of Civil Procedure 54.04(2), which states that:

> Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees for depositions or trials, and guardian ad litem fees . . .

When determining whether to award discretionary costs, trial courts are directed to:

> (1) determine whether the party requesting the costs is the "prevailing party;" (2) limit awards to the costs specifically identified in the rule; (3) determine whether the requested costs are necessary and reasonable; and (4) determine whether the prevailing party has engaged in conduct during the litigation that warrants depriving it of the discretionary costs to which it might otherwise be entitled.

*Massachusetts Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 35 (Tenn. Ct. App. 2002).

Parties are not entitled to costs under Tennessee Rule of Civil Procedure 54.04(2) simply because they prevail at trial. *Sanders v. Gray*, 989 S.W.2d 343, 345 (Tenn. Ct. App. 1998). The particular equities of the case may influence a trial court's decision about these costs. *Perdue v. Green Branch Mining Co.*, 837 S.W.2d 56, 60 (Tenn. 1992); *Stalsworth v. Grummons*, 36 S.W.3d 832, 835 (Tenn. Ct. App. 2000). "However, the courts should, as a general matter, award discretionary costs to a prevailing party if the costs are reasonable and necessary and if the prevailing party has filed a timely and properly supported motion." *Massachusetts Mut. Life Ins. Co.*, 104 S.W.3d at 35 (citing *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 85 (Tenn. Ct. App. 2000)). The award of discretionary costs, like the award of other costs, is within the trial court's reasonable discretion. *Perdue* 837 S.W.2d at 60. "Because these decisions are discretionary, we are generally disinclined to second-guess a trial court's decision unless the trial court has abused its discretion." *Massachusetts Mut. Life Ins. Co.*, 104 S.W.3d at 35 (citing *Woodlawn Mem'l Park, Inc. v. Keith*, 70 S.W.3d 691, 698 (Tenn. 2002)).

The Church first argues that Mr. Sanders d/b/a SMS is not the prevailing party in this action. The Church points out that Mr. Sanders' d/b/a SMS claim against Pastor Holloway was dismissed, as was SMS' contract claim. While Mr. Sanders individually was awarded

-33-

no damages, and the court refused to award SMS damages directly under the contract, the trial court did award SMS $120,446.47 for additional work that was done by SMS as a direct subcontractor on the project. In considering an award of costs, the Tennessee Supreme Court has noted that "a party need not attain complete success on the merits of a lawsuit in order to prevail. Rather, a prevailing party is one who has succeeded 'on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Fannon v. City of LaFollette*, 329 S.W.3d 418 (Tenn. 2010) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). Because SMS was awarded damages against the Church, we conclude that the chancellor did not abuse his discretion in determining that SMS was a prevailing party for the purposes of discretionary costs.

The Church also notes that, while the claims were later voluntarily dismissed,[16] the two parties had also filed claims against each other. According to the Church, these claims contributed to the costs of the litigation, but were taxed only to the Church in the award of discretionary fees. However, from our review of the record, it is clear that both Bricks and SMS focused entirely on their claims against the Church in this litigation. From the beginning, counsel for Bricks and SMS represented that they were "aligned" in this litigation and intended to work out any remaining issues between them independent of the court.

Additionally, both Bricks and SMS submitted invoices detailing the costs associated with this litigation. However, the Church argues that these invoices include charges for transcripts, the cost of which are not properly awarded as discretionary costs under Tennessee Rule of Civil Procedure 54.04(2). Specifically, Rule 54.04(2) limits discretionary costs to "reasonable and necessary court reporter expenses for depositions or trials, . . . expert witness fees for depositions (or stipulated reports) and for trials, . . . interpreter fees for depositions or trials, and guardian ad litem fees." The Church cites *Massachusetts Mutual Life Insurance Company v. Jefferson*, 104 S.W.3d 13 (Tenn. Ct. App. 2002), for the proposition that the trial court may not award fees for transcripts as discretionary costs. However, the fees in *Massachusetts Mutual* were labeled "document expenses," rather than expenses specifically for trial or deposition transcripts. *Id.* at 35. Tennessee Rule of Civil Procedure 54.04(2) allows an award of costs for "court reporter expenses for depositions or trials." Indeed, in *Freeman v. CSX Transportation, Inc.*, --- S.W.3d ----, 2010 WL 4366080 (Tenn.

---

[16] The Church asserts that SMS' and Bricks' dismissal of claims against each other was a "questionable" legal "maneuvering" because SMS' claim against the Church under the contract was already dismissed on the merits. However, the Church mistakenly cites Tennessee Rule of Civil Procedure 41.01(1) for the proposition that no voluntary dismissal can be taken after trial. Tennessee Rule of Civil Procedure 41.01(1) states that "the plaintiff shall have the right to take a voluntary nonsuit to dismiss an action *without prejudice by* filing a written notice of dismissal at any time before the trial of a cause." Tenn. R. Civ. P. 41.01(1) (emphasis added). In this case, Bricks and SMS entered into a consent order dismissing their claims *with prejudice.* Therefore Tennessee Rule of Civil Procedure 41.01(1) is inapplicable.

Ct. App. 2010), this Court stated that "the trial court correctly limited the award to costs specifically identified in Rule 54.04(2)" including "$21,248.08 for costs associated with court reporters and deposition transcriptions." **Id.** at *7; *see also* **Lock v. National Union Fire Ins. Co.**, 809 S.W.2d 483, 489–90 & 489 n.3 (Tenn. 1991) (awarding "the transcription costs of the deposition of Plaintiff" as reasonable and necessary discretionary costs). From the evidence as a whole, we cannot conclude that the chancellor abused his discretion in awarding discretionary costs to both SMS and Bricks.

## IV. Conclusion

The judgment of the Chancery Court of Shelby County is affirmed in part and vacated in part. This matter is remanded to the trial court for further proceedings consistent with this opinion. We modify the trial court's award of delay damages to Bricks to reflect the proper amount of $39,000.00 (as opposed to the $53,333.00 original award). All issues not specifically vacated or modified are affirmed. Costs of this appeal are taxed one-third to appellant Breath of Life Christian Church, Inc., and its surety, one-third to Appellee George Sanders, d/b/a SMS Contractors, Inc.,and one-third to Bricks, Inc., for all of which execution may issue if necessary.

_____

J. STEVEN STAFFORD, JUDGE